**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP DIVISION**

------------------------------------------------------------------------x

In re:

MEMORY LANE MUSIC GROUP, LLC                    No. 22-70838 (AST)
                                                 Chapter 11

      Debtor.

------------------------------------------------------------------------x

WILLIAM BUNCH, LISA BUNCH, LYNNE BUNCH,
SUSAN ANTHONY, JEANNE RAINS,
GARY ROWLES, and THE ASCAP FOUNDATION,

      Plaintiffs,

      v.

MEMORY LANE MUSIC GROUP, LLC

      Defendant.

------------------------------------------------------------------------x

## COMPLAINT TO DETERMINE DISCHARGEABILITY
## OF DEBTS DUE AND OWING PLAINTIFFS

Pursuant to Section 523 of Title 11 of the United States Code (the "Bankruptcy Code"),

the Plaintiffs, William Bunch, Lisa Bunch, Lynne Bunch, Susan Anthony, Jeanne Rains, Gary

Rowles, and The ASCAP Foundation, file this complaint to determine dischargeability of debts

due and owing Plaintiffs by Defendant Memory Lane Music Group, LLC ("Debtor"). Plaintiffs,

as and for their Complaint against Debtor, allege as follows:

### THE PARTIES

1.      Plaintiff William Bunch is a resident and citizen of the State of Arizona and is

the great Grandson of Peter DeRose.

2.      Plaintiff Lisa Bunch is a resident and citizen of the State of Maine and is the great

Granddaughter of Peter DeRose.

1

3.      Plaintiff Lynne Bunch is a resident and citizen of the Commonwealth of Virginia and is the surviving wife of Peter Bunch, the grandson of Peter DeRose.

4.      Plaintiff Susan Anthony is a resident and citizen of the State of California and the Granddaughter of Harry Ruby.

5.      Plaintiff Jeanne Rains is a resident and citizen of the State of Texas and the Granddaughter of Harry Ruby.

6.      Plaintiff Gary Rowles is a resident and citizen of the State of Oregon and the son of Jimmy Rowles.

7.      Plaintiff The ASCAP Foundation is a not-for-profit 501(c)(3) charitable corporation, with its principal place of business located in New York, New York, and is the successor-in-interest to the copyrights and related rights of the musical works authored or co-authored by Harold Adamson.

8.      Defendant Memory Lane Music Group, LLC is a New York limited liability company that commenced the above referenced action in this Court.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1409.

11.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## FACTS COMMON TO ALL COUNTS

**Background.**

*The Peter DeRose Catalog.*

12.     Prior to September 24, 1982, DeRose Music Co. was established to administer the publishing and royalty interests of musical compositions authored by Peter DeRose, an acclaimed American composer inducted into the Songwriters Hall of Fame in 1970.

13.     By agreement dated September 24, 1982 (the "DeRose Foreign Collection Agreement"), DeRose Music Co. authorized Memory Lane Music, Limited to act as its collecting agent with respect to certain foreign royalties earned by songs in the DeRose Music Co. catalog. Larry Spier, Jr. signed the DeRose Foreign Collection Agreement on behalf of the Memory Lane parties. Ex. B.

14.     The DeRose Foreign Collection Agreement extended to December 31 of each year and automatically renewed for one-year periods, unless either party timely provided notice of termination. *Id.*

15.     Debtor was established in or around 2006 and, at that time, acquired the rights and obligations to the DeRose Foreign Collection Agreement. *See* Ex. A at 13:10-13:12, 14:16-14:24, 63:17-21.

16.     Under the agreement, Debtor was "authorized to license the copyright use of a particular musical work." *See* Dkt. 2 at 2.  Debtor received the money from the use of musical work and then would take a percentage of the earnings as commission for their services; the remainder was to be paid to the songwriter or its heirs. *See id.*; *see also* Ex. A at 10:7-11:3.

17.     The DeRose Foreign Collection Agreement further required semi-annual accountings of all monies collected in the subject territories to be provided to DeRose Music Co.,

3

accompanied by the payment of a percentage of the collected income "computer at the source." Ex. B.

18.    Plaintiffs William, Lisa and Lynne Bunch are the successors-in-interest to the rights of DeRose Music Co. under the DeRose Foreign Collection Agreement.

19.    For years, Debtor paid the monies owed pursuant to the DeRose Foreign Collection Agreement to the Songwriters Guild of America ("SGA") so that the royalties could be paid to Plaintiffs William, Lisa and Lynne Bunch. *See* Ex. A at 63:17-63:21.

20.    By letter dated May 31, 2019, the DeRose Foreign Collection Agreement was terminated, effective December 31, 2019.  Ex. F.

*The Harry Ruby Catalog.*

21.    At all times relevant, Charles U. Busch ("Busch"), was the successor in interest to the earnings arising from the musical compositions authored by Harry Ruby, an acclaimed composer and lyricist inducted into the Songwriters Hall of Fame in 1970.

22.    By agreement dated February 4. 1999 (the "Ruby Foreign Collection Agreement"), Busch authorized Memory Lane Music, Limited to act as its collecting agent with respect to certain foreign royalties earned by songs composed by Harry Ruby. Larry Spier, Jr. signed the Ruby Foreign Collection Agreement on behalf of the Memory Lane parties.  Ex. C.

23.    The Ruby Foreign Collection Agreement extended to June 30 of each year and automatically renewed for one-year periods, unless either party timely provided notice of termination of the agreement. *Id.*

24.    Debtor acquired the rights and obligations to the Ruby Foreign Collection Agreement in approximately 2006. *See* Ex. A at 13:10-13:12, 14:16-14:24, 82:6-82:13.

4

25.    Under the agreement, Debtor was "authorized to license the copyright use of a particular musical work." *See* Dkt. 2 at 2.  Debtor received the money from the use of musical work and then would take a percentage of the earnings as commission for their services; the remainder was to be paid to the songwriter or its heirs. *See id.*; *see also* Ex. A at 10:7-11:3.

26.    The Ruby Foreign Collection Agreement further requires semi-annual accountings of all monies collected in the subject territories to be provided to SGA on Busch's behalf, accompanied by the payment of a percentage of the collected earnings "computed at source." Ex. C.

27.    Plaintiffs Susan Anthony and Jeanne Rains are the successors-in-interest to the rights of Busch under the Ruby Foreign Collection Agreement.

28.    For years, Debtor paid the monies owed pursuant to the Ruby Foreign Collection Agreement to SGA so that the royalties could be paid to Plaintiffs Susan Anthony and Jeanne Rains. *See* Ex. A at 82:6-82:9.

29.    By letter dated May 31, 2019, the Ruby Foreign Collection Agreement was terminated, effective June 30, 2019. Ex. G.

*The Jimmy Rowles Catalog.*

30.    Prior to August 27, 1981, Jimmy Rowles, a world-renowned jazz pianist, vocalist and composer, established Kudu Music Company to administer the publishing and royalty interests in musical compositions that he authored.

31.    By agreement dated August 27, 1981 (the "Rowles Foreign Collection Agreement"), Kudu Music authorized Memory Lane Music, Limited to act as its collecting agent with respect to certain foreign royalties earned by songs composed by Jimmy Rowles. Larry

Spier, Jr. signed the Rowles Foreign Collection Agreement on behalf of the Memory Lane parties. Ex. D.

32.     The Rowles Foreign Collection Agreement extended to December 31 of each year and automatically renewed for one-year periods, unless either party timely provided notice of termination of the agreement. *Id.*

33.     Debtor acquired the rights and obligations to the Rowles Foreign Collection Agreement in approximately 2006. *See* Ex. A at 13:10-13:12, 14:16-14:2478:9-78:16.

34.     Under the agreement, Debtor was "authorized to license the copyright use of a particular musical work." *See* Dkt. 2 at 2. Debtor received the money from the use of musical work and then would take a percentage of the earnings as commission for their services; the remainder was to be paid to the songwriter or its heirs. *See id.*; *see also* Ex. A at 10:7-11:3.

35.     The Rowles Foreign Collection Agreement further requires semi-annual accountings of all monies collected in the subject territories to be provided to Kudu Music accompanied by the payment of a percentage of the collected income "computed at the source." Ex. D.

36.     Plaintiff Gary Rowles is the successor-in-interest to the rights of the Kudu Music Co. under the Rowles Foreign Collection Agreement.

37.     For years, Debtor paid the monies owed pursuant to the Rowles Foreign Collection Agreement to SGA so that the royalties could be paid to Plaintiff Gary Rowles. *See* Ex. A at 78:9-78:12.

38.     By letter dated May 31, 2019, the Rowles Foreign Collection Agreement was terminated, effective December 31, 2019. Ex. H.

*The Harold Adamson Catalog.*

39.     At all times relevant, Gretchen Adamson and Eve Adamson (the "Adamsons") were the successors in interest to the royalties earned from the musical compositions written or co-written by Harold Adamson, an acclaimed lyricist who was inducted into the Songwriters Hall of Fame in 1972.

40.     By agreement dated January 24, 2001 (the "Adamson Foreign Collection Agreement"), the Adamsons authorized Memory Lane Music, Limited to act as their collecting agent with respect to certain foreign royalties earned by Harold Adamson's songs. Larry Spier, Jr. signed the Adamson Foreign Collection Agreement on behalf of the Memory Lane parties. Ex. E.

41.     The Adamson Foreign Collection Agreement extended to June 30 of each year and automatically renewed for one-year periods, unless either party timely provided notice of termination of the agreement. *Id.*

42.     Debtor acquired the rights and obligations to the Adamson Foreign Collection Agreement in approximately 2006. *See* Ex. A at 13:10-13:12, 14:16-14:24, 70:17-70:21, 76:21-76:24.

43.     Under the agreement, Debtor was "authorized to license the copyright use of a particular musical work." *See* Dkt. 2 at 2. Debtor received the money from the use of musical work and then would take a percentage of the earnings as commission for their services; the remainder was to be paid to the songwriter or its heirs. *See id.*; *see also* Ex. A at 10:7-11:3.

44.     The Adamson Foreign Collection Agreement further requires semi-annual accountings of all monies collected in the subject territories to be provided to the Adamsons

accompanied by the payment of a percentage of the collected income "computed at source." Ex. E.

45.    Plaintiff The ASCAP Foundation is the successor-in-interest to the rights of the Adamsons under the Adamson Foreign Collection Agreement.

46.    For years, Debtor paid the monies owed pursuant to the Adamson Foreign Collection Agreement monies to SGA so that the royalties could be paid to Plaintiff The ASCAP Foundation. *See* Ex. A at 70:17-70:21.

47.    By letter dated May 31, 2019, the Adamson Foreign Collection Agreement was terminated, effective June 30, 2019. Ex. I.

**Nondischargeability Under 11 U.S.C. § 523(a)(4) and (6).**

48.    In in or around the year 2012, Debtor ceased making the required accountings and payments under the Foreign Collection Agreements. Ex. J. Debtor continued to collect the royalties pursuant to the Foreign Collection Agreements; it simply decided to keep the money – both its commission and the money it owed Plaintiffs – for itself. Ex. A at 64:20-64:23, 70:24-71:5; 79:3-79:6, 82:18-82:21; *see also* Dkt. 2 at 2-3.

49.    Debtor neither timely submitted accountings nor payment for the semi-annual periods ending on June 30, 2012; December 31, 2012; June 30, 2013; December 31, 2013; June 30, 2014; December 31, 2014; June 30, 2015; December 31, 2015; June 30, 2016; December 31, 2016; June 30, 2017; and December 31, 2017. Ex. J.

50.    In or around April 2018, Plaintiffs, through their common administrator, SGA, discovered Defendants' failure to pay over foreign monies collected by Debtor on behalf of the Plaintiffs. Upon discovering Debtor's failure to account, in or around April 2018, SGA, on

behalf of Plaintiffs, contacted Debtor and demanded all past accountings and payments of all royalties due under the Foreign Collection Agreements. *Id.*

51.    Debtor has admitted that, other than commission, it does not have a possessory right or interest in the monies collected pursuant to the Foreign Collection Agreements. *See e.g.*: Dkt. 2 at 2-3; Ex. J.

52.    Debtor has admitted that it nonetheless intentionally maintained dominion over the monies to the exclusion of Plaintiffs. Dkt. 2. at 3.

53.    Notwithstanding Debtor's admission of its debts, for the past four years, Debtor has refused to pay the monies owed. *See id.* By doing so, it wrongfully withheld the monies owed Plaintiffs and derogated Plaintiffs' rights.

54.    Debtor has been unable to produce a consistent amount that it owes Plaintiffs, but the amounts it admits it owes have always been substantially higher than $50,000. For example, Debtor provided a purported accounting for the Missing Accounting Periods, showing a total sum claimed to be owed of $459,198.43 under the Foreign Collection Agreements. Ex. J. In the time since, Debtor has been unable to provide a consistent amount owed. For example, Debtor stated in its Voluntary Petition that it owes the heirs to those four songwriters a combined $470,058.82. Dkt. 2 at 8-9.

55.    As a result, Debtor converted Plaintiffs' money. Further, the current amount that Debtor has admitted it intentionally and wrongfully withheld is between $50,000 and $1,000,000. As such, based on the information Debtor has provided, Debtor has violated N.Y. Penal Law § 155.40 (Grand Larceny in the Second Degree), a class C felony.

56.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged in the amounts owed by Debtor.

57.    Monies received through "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are not dischargeable. 11 U.S.C. § 523(a)(4).

58.    Therefore, Debtor's debts to Plaintiffs cannot be discharged pursuant to 11 U.S.C. §§ 523(a)(4) and 1192(2).

59.    To render Debtor judgment proof, Debtor, by and through its Managing Member, Mark Spier, and his wife, Lori Spier, has attempted to move Debtor's assets off of its books. Specifically, (1) Debtor allowed Mr. and Mrs. Spier to withdraw Debtor's money in order to buy a 50% interests in Adaken Music Holding, LLC and Princess Lola Music, LLC and then the Spiers utilized a series of transactions in an attempt to obscure Debtor's true ownership; (2) Debtor allowed another company that Mr. Spier owns, Royalty Solutions Corporation, to extract funds to take over Debtor's business and leave Debtor judgment-proof; and, (3) Debtor allowed Mr. Spier to siphon its money to pay off debts Mr. Spier owes his sister.[1]

*Adaken Music Holding, LLC, Princess Lola Music, LLC, Logan Drew Music, LLC, and Lori Spier.*

60.    Adaken Music Holding, LLC and Princess Lola Music, LLC own copyrights of songs. For example, Adaken Music Holding, LLC – which does business as Galahad Music and September Music – owns the copyright to the "Chicken Dance." *See* Ex. K at 1. According to Mr. Spier's prior testimony, Adaken Music Holding, LLC alone brings in an average of $100,000 per year. *See* Ex. L at 27:19-28:12.

61.    Mark Spier testified under oath that he does not own Adaken Music Holding, LLC and Princess Lola Music, LLC. *Id.* at 28:22-28:25, 42:21-42:24. However, Mr. Spier previously declared in federal court that he was the owner of Adaken Music Holding, LLC and posted online

---

[1] Plaintiffs have not included in their allegations information regarding the subsidiaries that have separately commenced bankruptcy proceedings in this Court. It appears unnecessary given the pendency of Debtor's motion to combine substantively the Debtor's bankruptcy with those of its subsidiaries.

that Debtor had merged with the entities with which Adaken Music Holding, LLC does business as. Ex. M at 1; *see* Ex. K at 1.

62.    On paper, Logan Drew Music, LLC, owns a 50% interest in Adaken Music Holding, LLC and Princess Lola Music, LLC. Logan Drew Music, LLC is owned by Lori Spier and the "Mark Spier Family Trust No. 2." Ex. L at 29:10-29:12. Mr. Spier testified under oath "I'm not an officer of [Logan Drew]. Or anything to do with that corporation." Ex. K at 9:19-9:21. Nevertheless, Mark Spier has told at least one bank that he is both a "member" and the "manager" of Logan Drew Music, LLC.

63.    As of November 30, 2018, Logan Drew, Mark Spier Family Trust No. 2, and Lori and Mark Spier's personal City National Bank accounts all contained less than $20,000.

64.    Nevertheless, Logan Drew Music, LLC purchased its interest in Adaken Music Holding, LLC and Princess Lola Music, LLC on November 30, 2018 when Mark Spier sent a wire of $25,000 on behalf of Logan Drew to Debtor's parent company, Spier Music Holding, LLC (the prior owner of the interest in those companies).

65.    The money Logan Drew Music, LLC used to purchase Adaken Music Holding, LLC and Princess Lola Music, LLC came from Debtor and was laundered through several other bank accounts to obscure these facts:

    a.    On November 30, 2018, MLMG transferred $20,000 to Mark and Lori Spier's personal bank account.

    b.    That same day, there was a transfer of $20,300 from Mark and Lori Spier's personal bank account to the Mark Spier Family Trust No. 2 bank account.

    c.    Again, that same date, the Mark Spier Family Trust No. 2's bank account transferred $20,160 to Logan Drew's bank account.

    d.   Thus, $20,000 of the $25,000 that Logan Drew paid to purchase the interest in Adaken Music Holding, LLC and Princess Lola Music, LLC came from Debtor.

66.    The other $5,000 that Logan Drew Music, LCC used to purchase Adaken Music Holding, LLC and Princess Lola Music, LLC came from Debtor as well:

    a.   On November 26, 2018, MLMG paid Lori Spier $5,200 to her personal account, even though Lori Spier neither worked for Debtor nor received any loans from it. Ex. A at 33:15-33:17; *see* Ex. N.

    b.   Two days later, Logan Drew cashed a $5,000 check from that same personal account for "membership purchase."

    c.   Before that $5,000 check was cashed, Logan Drew had $40 in its bank account.

67.    Thus, Debtor, Mark Spier, and Lori Spier used Debtor's money to purchase valuable assets but funneled the money in a way to make it appear that a non-debtor owned them.

68.    The substantial amounts received from the interest in Adaken Music Holding, LLC and Princess Lola Music, LLC could and should have been used to pay Debtor's creditors, including Plaintiffs.

*Royalty Solutions Corporation.*

69.    Royalty Solutions Corporation is a company that Mark Spier founded and co-owns. Ex. O. He is also the CEO. *Id.* at 2.

70.    Royalty Solutions Corporation provides royalty processing, licensing, and accounting services. *Id.* at 1.

71.     The type of work that Royalty Solutions Corporation does includes the same type of work that Debtor does. *See* Ex. P at 50:11-50:15.

72.     Mark Spier has siphoned work from Debtor to Royalty Solutions Corporation. *See id.*; *see also* Ex. L at 36:16-36:25.

73.     In addition, Debtor has "loaned" Royalty Solutions Corporation money for years. Royalty Solutions Corporation owes Debtor hundreds of thousands of dollars. Debtor has not included these loans in its list of assets. *See generally* Dkt. 1.

74.     Royalty Solutions Corporation and Debtor shared employees. *Id.* at 18:20-19:2. Debtor has paid for those employees' salaries.

75.     At least one individual who represented that she was working on behalf of Royalty Solutions Corporation publicly stated that she has never worked for that company but has worked for Debtor. Compare Ex. P at 50:16-50:24, with Ex. Q.

76.     Thus, Debtor, by and through Mark Spier, used Debtor's assets to take over Debtor's business and leave Debtor judgment-proof.

77.     The substantial amounts improperly withdrawn from Debtor to fund Royalty Solutions Corporation, and the money made through the latter's active business, could and should have been used to pay Debtor's creditors, including Plaintiffs.

*Spier Music Holding, LLC.*

78.     Debtor used to be owned by Mark Spier and his sister, Roberta Kladerman. Ex. L at 13:25-14:19.

79.     Mark Spier created a new company, Spier Music Holding, LLC, to buy Ms. Kladerman's interest in MLMG via a $1,005,000 Promissory Note. Ex. R at 2; *see* Ex. L at 15:21-16:5.

80.     The monies owed were guaranteed by Mark Spier but were ostensibly paid through distributions of MLMG's profits. Ex. A at 154:2-154:25, 156:3-156:19, 192:20-193:6.  Under the agreement, monies paid to the members "shall be distributed to the Members in proportion to their Percentage Interests."  Ex. R at 7.

81.     Mark Spier reported to the Internal Revenue Service that he received no distributions from MLMG between 2014 and 2017.

82.     Thus, there should have been no distributions paid to Spier Music Holding, LLC between 2014 and 2017. The monies should have been paid from the guarantor, Mark Spier.

83.     Nevertheless, Spier Music Holding, LLC paid the monies owed on the promissory note to Roberta Kladerman from 2014 to 2017.  Ex. A at 192:11-193:6.

84.     In addition, Debtor provided substantial no-interest loans to Mark Spier that were "reclassified" as either a guaranteed payment or distribution, depending on whether the Debtor made money.  Compare Ex. A at 31:9-31:19, with *id.* at Errata 1.

85.     Thus, Debtor allowed its money to be siphoned to Mark Spier and his family.

86.     The monies drained from Debtor to Mark Spier and his family could have been used to pay Debtor's creditors, including Plaintiffs.

*Conclusion.*

87.     Debtor's involvement in purchase of the interests in Adaken Music Holding, LLC and Princess Lola Music, LLC; its participation in actions designed to obscure Debtor's true ownership; the drainage of Debtor's assets to bolster another company that Mr. Spier owns leading to takeover of Debtor's business in order to leave Debtor judgment-proof; and the siphoning of money to Mr. Spier, constitute a fraud and caused a willful malicious injury to Plaintiffs.

88.     The above actions were willful and malicious actions by an officer of the Debtor

that caused injury to Plaintiffs.

89.     As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged in the amounts owed by Debtor.

90.     As such, the debts owed by the Debtor to Plaintiffs are nondischargeable under Section 523(a)(6) of the Bankruptcy Code.

## COUNT ONE

### (Nondischargeability Under § 523(a)(4) of the Bankruptcy Code)

91.     Paragraphs 1 through 90 are hereby incorporated as paragraph 91 as if fully set forth herein.

92.     The debts owed by the Debtor to Plaintiffs are nondischargeable under Section 523(a)(4) of the Bankruptcy Code.

## COUNT TWO

### (Nondischargeability Under § 523(a)(6) of the Bankruptcy Code)

93.     Paragraphs 1 through 90 are hereby incorporated as paragraph 93 as if fully set forth herein.

94.     The debts owed by the Debtor to Plaintiffs are nondischargeable under Section 523(a)(6) of the Bankruptcy Code.

**WHEREFORE**, Plaintiffs pray that the Court:

a) Determine that Plaintiffs' claims are nondischargeable under § 523(a)(4) of the Bankruptcy Code;

b) Determine that Plaintiffs' claims are nondischargeable under § 523(a)(6) of the Bankruptcy Code;

c) Enter judgment in favor of the Plaintiffs and against the Debtor;

d) Grant such other and further relief as is just, including reasonable costs and attorneys' fees.

Dated: July 15, 2022
        New York, NY

ROBINSON & COLE, LLP

By: _____
    Glenn Greenberg
    666 Third Ave., 20th Floor
    New York, NY 10017
    (212) 451-2933

    *Attorney for Plaintiffs*